# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

KEITH C. JOHNSON,

                Plaintiff,

      v.

RLI INSURANCE COMPANY,

                Defendant.

Case No. 3:14-cv-00095-SLG

## ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT

Before the Court are the parties' cross-motions for summary judgment. The motions have been briefed; oral argument was held on August 20, 2015.[1] The Court has jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332 because the parties are diverse and the Complaint alleges damages greater than $75,000.[2] For the reasons set forth below, the Court will deny Mr. Johnson's motion for summary judgment and grant RLI's cross-motion for summary judgment.

## BACKGROUND

On July 18, 2011, a Chevrolet Suburban driven by Robert Stenehjem, Sr. left the road while returning to Soldotna after a halibut fishing trip. The vehicle had three

---

[1] Docket 42 (Johnson Mot.); Docket 50 (RLI Opp'n); Docket 73 (Johnson Reply); Docket 52 (RLI Mot.); Docket 77 (Johnson Opp'n); Docket 84 (RLI Reply); Docket 93 (Minutes).

[2] *See* Docket 1-1 (Complaint) at 1, 8.

passengers, one of whom was the plaintiff, Keith Johnson. Robert[3] was killed in the accident, and Mr. Johnson was severely injured.[4]

The men were returning to a cabin in Soldotna that was owned by a limited liability company. The limited liability company, PWC, was formed in 2006 by Robert's brother John Stenehjem, and two other men, Mike Flaa and Robert Neill.[5] John had been the managing member of the LLC and the signatory on the Articles of Organization for the LLC.[6]

PWC owned two vehicles that were kept at the cabin, a 2000 GMC pickup truck and the 1999 Chevy Suburban.[7] John purchased the Suburban with his own funds on behalf of PWC, but the record is silent regarding whether he was reimbursed by PWC.[8] The parties do not dispute that the Suburban was registered to PWC, and an Allstate insurance policy for the Suburban was issued to PWC (after a correction).[9] The Suburban was the vehicle driven on the halibut fishing trip.

---

[3] The Court will refer to Robert Stenehjem, Sr. and John Stenehjem by their first names so as to avoid confusion.

[4] Docket 1-1 (Complaint) at ¶ 5.

[5] Docket 43-2 (Neill 30(b)(6) Depo.) at Tr. 7–9, 36; Docket 43-6 (Articles).

[6] Docket 43-2 (Neill 30(b)(6) Depo.) at Tr. 19; Docket 43-6 (Articles).

[7] Docket 43-2 (Neill 30(b)(6) Depo.) at Tr. 24.

[8] *See* Docket 43-2 (Neill 30(b)(6) Depo.) at Tr. 26–27.

[9] Docket 51-19 at 2; Docket 51-14 (Registration) at 3. The registration that is cited by the parties expired in 2014, but the effective date is not set out on the document. *See, e.g.*, Dockets 51-2, 51-14, 51-24.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 2 of 21

John may have also had his own vehicle at the cabin at the time of the accident, but the record is unclear. The record is also unclear as to whether John had driven the Suburban in the days preceding the accident after the guests had arrived for the fishing trip. The four men in the Suburban at the time of the accident—Robert, Mr. Johnson, and two others—were all John's guests at the cabin. John was also present at the cabin at the time of the accident but did not go in the Suburban on the halibut fishing trip.[10]

Guests were not to use PWC's vehicles unless given permission by a member. PWC members had an understanding among them that whoever invited guests to the cabin was the member responsible for giving the guests permission to use PWC's vehicles, as warranted.[11] However, after the accident John stated in an email, a phone conversation, and an affidavit that he had not given Robert permission to use the Suburban for the halibut fishing trip.[12] John stated that Robert had been given permission by another unspecified member of PWC.[13] Mr. Neill, the only surviving member of PWC, testified at PWC's 30(b)(6) deposition that he did not know if John had given Robert permission to use the Suburban.[14] Mr. Neill and John were the only PWC members present at the cabin that week.[15]

---

[10] Docket 43-2 (Neill 30(b)(6) Depo.) at Tr. 51, 59, 61–62, 64, 66, 68.

[11] Docket 43-2 (Neill 30(b)(6) Depo.) at Tr. 34–35, 40, 48.

[12] Docket 51-1 (John Aff.) at ¶ 11; Docket 51-22 (Email); Docket 51-25 (Summary) at 2.

[13] Docket 51-22 at 2; Docket 51-25 at 2.

[14] Docket 51-17 (Neill 30(b)(6) Depo.) at Tr. 77–78.

[15] Docket 51-17 (Neill 30(b)(6) Depo.) at Tr. 59–60.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 3 of 21

The RLI umbrella policy at the center of this case was first issued to John when he resided in Alaska in 2003.[16] When John and his wife, Javayne, moved to Arizona, a renewed policy was issued to reflect this change.[17] The policy in effect at the time of the accident listed their Arizona address as their primary residence, and covered two vehicles, neither of which was the Suburban.[18] Mr. Neill testified that John and Javayne continued to spend time at the Soldotna cabin even after they moved to Arizona.[19]

After the accident, Mr. Johnson sued Robert's estate in North Dakota state court. Allstate (under the policy for the Suburban) and QEB Farmers Union (under Robert's own personal policy) combined to defend the Estate.[20] Mr. Johnson made a formal demand on RLI on May 15, 2012.[21] After investigating the claim, RLI formally notified Mr. Johnson's attorney on September 19, 2012 that it would not be responding to Mr. Johnson's claim.[22] On October 11, 2012, Mr. Johnson's attorney corresponded with Allstate and shared his opinion that John's RLI umbrella policy would not provide coverage because "[t]he only arguable claim would be that [John] borrowed the vehicle [from PWC] from time to time." After surveying the case law, Mr. Johnson's attorney

---

[16] Docket 43-8 (Application); Docket 51-17 (Neill 30(b)(6) Depo.) at Tr. 40–41.

[17] Docket 51-2 (Renewal) at 5–6; Docket 51-5 (Policy) at 3; Docket 51-17 (Neill 30(b)(6) Depo.) at Tr. 41–42.

[18] *See* Docket 51-2 (Javayne Stenehjem Decl. & Renewal) at 2, 5; Docket 51-5 (Policy) at 3.

[19] Docket 51-17 (Neill 30(b)(6) Depo.) at Tr. 41–42.

[20] Docket 51-20 (Cost Sharing Agreement); Docket 51-19.

[21] Docket 51-11 (Letter).

[22] Docket 43-14 (Formal Denial Letter) at 1; Docket 51-9; Docket 51-12; Docket 51-13 (Letter).

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 4 of 21

concluded that the "[t]he definition of 'borrow' used by courts interpreting insurance provisions likely does not apply to the case at hand."  He reasoned that "[t]he most likely application of the definition to the policy language is that the insured is currently borrowing the vehicle and has control over the vehicle in the sense that he can then transfer possession of it to third parties."  Based on his review of the facts, "John Stenehjem did not obtain possession of the vehicle prior to Johnson's use of it."[23]

RLI prepared an affidavit to which John made changes and signed on January 14, 2013, stating that he had not given Robert (or anyone else) permission to drive the Suburban.[24]  RLI sent the affidavit to the attorney for Robert's Estate on January 18, 2013, with a denial letter.[25]

Robert's Estate settled with Mr. Johnson in early 2013.[26]  Under the terms of the settlement, the Estate agreed to the entry of judgment in the North Dakota state court in the amount of $2,293,237.87, which that court approved on April 2, 2013.  The settlement agreement contained clauses providing that the judgment could not be satisfied from any of the Estate's property.  Rather, as part of the settlement agreement, Robert's Estate assigned any claims it may have had against RLI to Mr. Johnson.  Allstate and QEB paid

---

[23] Docket 51-6 (Letter) at 2–4.  As Mr. Johnson notes in his brief, his former attorney's position on this issue would support a claim by Mr. Johnson for UIM coverage from Allstate and/or QEB. *See* Docket 74 at 24.

[24] Docket 51-1 (Affidavit).

[25] Docket 51-30 (Letter).

[26] Docket 43-15 (Letter); Docket 43-17 (Judgment) at 10.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 5 of 21

out their policy limits in partial satisfaction of the judgment contemporaneously with the settlement.[27]

On June 28, 2013, Mr. Johnson's attorney restated his opinion that the RLI policy did not provide coverage, stating in a letter that "[g]iven the [a]ffidavit of Mr. Stenehjem, it is my opinion that RLI is on solid ground and that any claim under that policy would be without merit."[28] John passed away the following year, in January 2014.[29] He had not been deposed prior to his death. Mr. Johnson filed this case against RLI on April 29, 2014.[30]

## **DISCUSSION**

Mr. Johnson moves for summary judgment on Counts I and II of the Complaint. Count I requests a declaratory judgment that Robert is covered under the RLI policy and that RLI had a duty to defend the Estate. Count II alleges breach of contract by RLI for failing to defend and indemnify.[31] RLI filed a cross-motion for summary judgment on all of Mr. Johnson's claims, including Count III—a claim for bad faith breach and punitive damages.

---

[27] Docket 43-17 (Judgment) at 3, 7–8, 11.

[28] Docket 51-7 (Letter).

[29] Docket 51-2 (Javayne Stenehjem Decl.).

[30] Docket 1-1 (Complaint) at 8.

[31] Docket 1-1 (Complaint) at ¶¶ 21–29.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 6 of 21

## I.    Choice of Law

 As a preliminary matter, the parties dispute the proper law to apply to the issues before the Court.  Mr. Johnson asserts that Alaska substantive law governs the entire dispute.[32]   RLI asserts that Arizona law governs the construction of the insurance contract, while North Dakota law governs any issues relating to performance, breach, and bad faith.[33]

A court applies the choice of law rules of the forum state—in this case, Alaska.[34] The RLI policy does not contain any choice of law provision.  Therefore, under Alaska law, the Restatement (Second) of Conflict of Laws applies, specifically Section 188: Law Governing in Absence of Effective Choice by the Parties.[35]   That section directs a court to determine which state "has the most significant relationship to the transaction and the parties."[36]  Instructive in this determination are: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties."[37]   A court should evaluate the contacts "according to their relative importance with respect to the particular issue."[38]

---

[32] Docket 74 at 2–6.

[33] Docket 50 at 23–26.

[34] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[35] *See Long v. Holland Am. Line Westours, Inc.*, 26 P.3d 430, 433–33 (Alaska 2001).

[36] Restatement (Second) of Conflict of Laws § 188(1).

[37] Restatement (Second) of Conflict of Laws § 188(2).

[38] *Id.*

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 7 of 21

Mr. Johnson asserts that because the Court applied Alaska law to the issues surrounding the discovery of the fee-splitting agreement, the Court should continue to apply Alaska law.[39]  But RLI is correct that the law of a different forum may apply to different issues in a case.[40]

The current motion concerns the interpretation of the RLI insurance policy.  A prior insurance contract was issued to John when he lived in Alaska in 2003.[41]  The applicable insurance policy was issued to John when his primary residence was in Arizona.[42]  The applicable policy contains a State of Arizona Amendatory Endorsement so as to be in accordance with the laws and regulations of Arizona.[43]  RLI is an Illinois company.[44]  The policy indicates that the Insurance Agent is located in Santa Rosa, California, and that John's Brokering Agent is located in Alaska.[45]  The conduct that forms the basis for the claim for coverage occurred in Alaska.  But that fact is not of high importance with respect to the particular dispute here concerning contract interpretation.  Rather, more significant is that Arizona was the primary residence of the insured, and the renewed contract

---

[39] Docket 74 at 3.

[40] Docket 50 (RLI Mot.) at 23; *Savage Arms, Inc. v. W. Auto Supply Co.*, 18 P.3d 49, 53 (Alaska 2001) ("The Second Restatement requires a separate choice-of-law analysis for each issue presented.").

[41] Docket 43-8 (Application).

[42] Docket 51-5 (Policy) at 3.

[43] See Docket 51-5 (Policy) at 13–14.

[44] Docket 51-5 (Policy) at 3.

[45] Docket 51-5 (Policy) at 3. The Court takes judicial notice that the 907 area code is for Alaska. *See* FED. R. EVID. 201.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 8 of 21

specifically included language to make it consistent with Arizona law. Based on a consideration of the applicable Section 188 factors, the Court holds that Arizona has the most significant relationship to matters of interpretation of the RLI umbrella policy. Accordingly, Arizona law will govern the interpretation of the contract.

RLI was asked to perform on the contract in North Dakota. The underlying lawsuit was filed in North Dakota against an estate being administered in North Dakota. The deceased, Robert, was also a resident of North Dakota. If RLI had a duty to defend the case, that defense would have occurred in North Dakota. And the judgment under which Mr. Johnson is seeking to collect was entered by a North Dakota court. North Dakota has the most significant relationship to the issues related to contract performance. Accordingly, North Dakota law will govern all issues of performance, including the bad faith and punitive damages claims.

## II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When considering a motion for summary judgment, a court must accept as true all evidence presented by the non-moving party and draw "all justifiable inferences" in the non-moving party's favor.[46] The burden of showing the absence of a genuine dispute of material fact initially lies with the

---

[46] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 9 of 21

moving party.[47]  If the moving party meets this burden, the non-moving party must present specific evidence demonstrating the existence of a genuine issue of fact.[48]  The non-moving party may not rely on mere allegations or denials.  To reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the non[-]moving party."[49]  If the evidence provided by the non-moving party is "merely colorable" or "not significantly probative," summary judgment to the moving party is appropriate.[50]

## III.   Duty to Defend

Mr. Johnson moves for summary judgment on Counts I and II, which include a claim for breach of the duty to defend and a claim for a declaratory judgment that RLI had such a duty.  Mr. Johnson asserts that even though RLI's policy was an umbrella policy, RLI had a duty to defend because Mr. Johnson's North Dakota complaint alleged a claim for damages that far exceeded the underlying primary liability insurance policies.[51]  RLI responds that Mr. Johnson's claim was not covered by John's personal umbrella policy, so there was no duty to defend that could be breached.[52]  And RLI notes that Mr. Johnson holds an assigned claim for indemnification of a judgment—not for unpaid defense

---

[47] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

[48] *Anderson*, 477 U.S. at 250; *Oracle*, 627 F.3d at 387.

[49] *Anderson*, 477 U.S. at 248.

[50] *Id.* at 249–50 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 84–85 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

[51] Docket 42 (Johnson Mot.) at 16–18; Docket 74 at 19–22.

[52] Docket 50 at 35–37.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 10 of 21

costs—so there can be no recovery for costs of defense when none were incurred.[53]  RLI adds that even if the claim were otherwise covered under the policy, the umbrella policy imposes no duty to defend so long as there is primary insurance that provides coverage for the loss.[54]

"Ordinarily, an insurer has a duty to defend an underlying action against its insured if the allegations in the complaint give rise to potential liability or a possibility of coverage under the insurance policy."[55]  "However, a duty to defend arises only if the conditions precedent to the policy . . . are met."[56]  North Dakota has not decided whether an excess insurer has a primary duty to defend.[57]  But the majority rule is that an excess or umbrella insurer has no duty to defend until the primary insurer's coverage is exhausted.[58]  This view accords with the plain language of the RLI policy, which states, "This insurance does not apply until after exhaustion of all other collectible insurance and/or other protection

---

[53] Docket 84 at 27.

[54] Docket 50 (RLI Mot.) at 35–37.

[55] *Hanneman v. Cont'l W. Ins. Co.*, 575 N.W.2d 445, 453 (N.D. 1998) (quoting *Nodak Mut. Ins. Co. v. Heim*, 559 N.W.2d 846 (N.D. 1997)).

[56] *Emp'rs Reinsurance Corp. v. Landmark*, 547 N.W.2d 527, 533 (N.D. 1996).

[57] One case, *Transamerica v. Farmers Insurance Exchange*, 463 N.W.2d 641, 643 (N.D. 1990), touched on the issue but ultimately did not offer guidance because the court found that the excess-insurance clause was not applicable.

[58] *See, e.g.*, *Duty of Insurer to Defend, Generally*, 44 AM. JUR. 2D INS. § 1402 ("Generally, an excess insurer has no duty to participate in the insured's defense until primary coverages are exhausted; when the same risk is covered by both primary and secondary insurance, the primary insurer has the primary duty to defend." (footnote omitted)); *General Rule Requiring Exhaustion of Primary Policy Limits*, 14 COUCH ON INS. § 200:41 (3d ed. 2005) ("Where an insured is covered by both a primary policy and an excess policy, the general rule is that the excess liability carrier is not obligated to participate in the defense until the primary policy limits are exhausted. Courts have justified this rule by relying on the terms and conditions of the excess policy." (footnote omitted)).

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 11 of 21

available to the insured (the Basic Policies, personal or commercial automobile insurance, employer's insurance and/or any other protection or indemnification whether primary, excess or contingent)."[59]

Mr. Johnson cites a Louisiana case, *Gleason v. State Farm Mutual Automobile Insurance Co.*, to argue that some courts find the excess insurer has a duty to defend even if there are primary insurers.[60]  In *Gleason*, the primary insurer tendered its policy limits to the court before the end of the case, independent of a settlement.  The trial court had held that once the primary insurer tendered its policy limits, the umbrella insurer had a duty to defend.   But on appeal, the Louisiana Court of Appeals for the Second Circuit reversed, and held that the trial court erred by holding that once the primary insurer paid its policy limits into the court registry it was released from its duty to defend and the excess insurer's duty to defend arose.  The appellate court reasoned that because the primary insurer had simply deposited its policy limits to the court before the end of the case without any settlement agreement, it was not released of its duty to defend.  The Court of Appeals observed that the excess insurer *might* owe a duty to defend at a later point in the case, because it was unclear then what additional damages might be found due in excess of the primary insurance.[61]

*Gleason* does not represent a departure from the majority rule.   Rather, it strengthens reliance on it.  The case affirms that an excess insurer's duty to defend arises

---

[59] Docket 51-5 (Policy) at 11.

[60] Docket 78 at 20; 660 So.2d 137 (La. Ct. App. 1995).

[61] *Gleason*, 660 So.2d at 139–40, 143–44.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 12 of 21

only after the primary insurer has fulfilled its duty to defend.  Here, the primary insurers fulfilled their duties to defend at the termination of the underlying case.  At that time, the primary insurers—Allstate and QBE—paid out their policy limits as part of the comprehensive settlement agreement reached in North Dakota on April 2, 2013.[62] Therefore, if RLI had any duty to defend, it would not have arisen until the North Dakota case was over.  Accordingly, the Court holds that even if Robert was covered by the RLI policy, RLI had no duty to defend the Estate in the North Dakota case.  The Court will grant summary judgment in favor of RLI with regard to the claims relating to a duty to defend in Counts I and II.

## IV.    Coverage Under the RLI Policy

The RLI policy primarily provides excess liability insurance coverage to John and his spouse.[63]  But it also provides that "[a]nyone else who uses an Automobile . . . you own, borrow, rent or use as a temporary substitute is covered if: (i) they use it with your express or implied permission; and (ii) the use is for the purpose you intended."[64]  It is on this provision that Mr. Johnson bases his coverage arguments.

Mr. Johnson asserts that (1) Robert was covered by John's RLI policy when he was driving the Suburban because John owned or borrowed the Suburban, or was using

---

[62] Docket 43-17 (Judgment) at 8, 11.

[63] *See* Docket 51-5 (Policy) at 5 (Throughout the policy, "[y]ou" means "the person named in the Declarations as the Named Insured and his or her spouse who lives in the same household.").

[64] Docket 51-5 (Policy) at 6.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 13 of 21

it as a temporary substitute at the time of the accident, and (2) John gave Robert permission to use the Suburban.[65]

As noted above, the Court will apply Arizona law to the interpretation of the umbrella policy.[66] In Arizona, the interpretation of an insurance contract is a question of law.[67] If a clause of the contract is ambiguous, the court should "look[] to legislative goals, social policy, and the transaction as a whole."[68] If the contract remains ambiguous after considering these guides, the language should be construed against the insurer.[69] But Arizona courts apply "a rule of common sense[;] thus, when a question of interpretation arises, [courts] are not compelled in every case of apparent ambiguity to blindly follow the interpretation least favorable to the insurer."[70]

### 1. Did John Own the Suburban?

The RLI policy does not define the term "own." Under Arizona law, "Owner" "means: (a) A person who holds the legal title of a vehicle."[71] Although the Arizona statute

---

[65] Docket 42 (Johnson Mot.) at 12–16; Docket 74 at 6–12. At oral argument on the motions, Mr. Johnson conceded that he was not making an argument under "rent." *See* Docket 93; Docket 50 (RLI Mot.) at 28.

[66] *See supra*, pages 7–9.

[67] *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 187 P.3d 1107, 1110 (Ariz. 2008).

[68] *Action Acquisitions, LLC*, 187 P.3d at 1110 (citing *Emp'rs Mut. Cas. Co. v. DGG & CAR, Inc.*, 183 P.3d 513, 515 (Ariz. 2008)).

[69] *Id.*

[70] *Emp'rs Mut. Cas.*, 183 P.3d at 515 (quoting *State Farm Mut. Auto. Ins. Co. v. Wilson*, 782 P.2d 727, 733 (Ariz. 1989)) (internal quotation marks omitted).

[71] AZ. REV. STAT. 28-101 (40); *see also* AS 19.10.399(10) ("'[O]wner' means a person, other than a lienholder, having the property in or title to a vehicle, including but not limited to a person entitled to the use and possession of a vehicle subject to a security interest in another person, but

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 14 of 21

uses the word "person," this is read in a common-sense manner to include entities as well.[72] An Arizona court of appeals has stated that even a company placing its logo on a vehicle and making primary use of that vehicle is not "determinative of ownership" when the vehicle was titled to another company.[73]

Here, the Suburban was titled to PWC. Mr. Johnson nevertheless argues that there is a triable issue of material fact as to ownership because John paid for the Suburban out of his own funds and signed his name for the vehicle at the salvage yard.[74] But neither of these facts generate a triable issue when the parties do not dispute that PWC was the titled owner of the vehicle. Under Arizona law and a common-sense reading of the term "own," the owner of a vehicle is the party that has title to the vehicle. Here, at the time of the accident, that was PWC, not John.[75] Testifying on behalf of PWC, Mr. Neill agreed at deposition that PWC owned the vehicle.[76] That John purchased the vehicle with his own funds has no bearing on the actual ownership of the vehicle.

---

exclusive of a lessee under a lease not intended as security."); BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "Own" as "[t]o rightfully have or possess as property; to have legal title to").

[72] *See Wallace Imports, Inc. v. Howe*, 673 P.2d 961, 969 (Ariz. Ct. App. 1983) (discussing vehicle owned by finance company); *Faz v. Ford Motor Credit Co.*, 953 P.2d 935, 938 (Ariz. Ct. App. 1997) ("[F]or purposes of Title 28, the title holder is the owner of a motor vehicle unless that vehicle is the subject of a lease with a purchase option, such as the one at issue here, in which case the lessee is the 'owner.'").

[73] *Am. Indem. Ins. Co. v. Code Elec. Corp.*, 760 P.2d 571, 574 (Ariz. Ct. App. 1988).

[74] Docket 42 (Johnson Mot.) at 13–14.

[75] John's umbrella policy lists two vehicles, neither of which was the Suburban. *See* Docket 51-2 (Javayne Decl. & Policy Change) at 2, 5.

[76] Docket 51-17 (Neill 30(b)(6) Depo.) at Tr. 24–39.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 15 of 21

Mr. Johnson's proffered facts do not create a "genuine dispute [of a] material fact."[77] Accordingly, the Court will grant summary judgment to RLI that John did not "own" the Suburban under the terms of RLI's umbrella policy.

### 2. Was John Borrowing the Suburban?

The RLI policy also does not define "borrow." Mr. Johnson asserts that when PWC members used PWC vehicles they were "borrow[ing]" them under the terms of the RLI policy.[78] RLI responds that John could not have "borrow[ed]" the Suburban under the policy because John already had the right to use the Suburban as a member of PWC and there is no indication that he physically exercised any control over the Suburban just prior when Robert drove it, as John was not part of the fishing party.[79]

In *American Indemnity Insurance Co. v. Code Electric Corp.*, employees of one corporation, Aztec, regularly drove vehicles owned by another corporation, Code Electric. Both corporations were owned by the same two people. An Aztec employee was involved in an accident while driving one of the Code Electric vehicles; the parties to the resulting coverage action disputed whether the "borrowed" language of Code Electric's insurance policy applied. The Arizona Court of Appeals held that "even though the term 'borrowed' is not defined in the insurance policy, its meaning is plain."[80] It held that the vehicle owned

---

[77] Fed. R. Civ. P. 56(a). And, as noted by RLI, when John signed for the Suburban at the salvage yard, he signed, "John Stenehjem, Manager, PWC, LLC." *See* Docket 84 at 20; Docket 43-7. The fact that John also signed his name, unaccompanied by "Manager, PWC, LLC," once on the salvage yard form does not show that John was the titled owner of the vehicle.

[78] Docket 42 (Johnson Mot.) at 13.

[79] Docket 50 (RLI Mot.) at 29–31.

[80] 760 P.2d at 574.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 16 of 21

by Code Electric but driven by Aztec's employee for several years constituted a vehicle that Aztec had "borrowed."  The court held that a "'borrowing' may be for an indefinite period and may last until either the borrower decides to return the property or the lender requests its return."[81]  Although the issue was not before the Arizona court, it appears the court assumed some sort of possession by the Aztec employee was necessary in order to borrow the vehicle.[82]

Outside of Arizona, courts and treatises have analyzed the issue as requiring some sort of physical possession by the borrower:

> The term "borrow" as it relates to this provision means that the insured receives both the benefit of the borrowed automobile's use and temporary possession, dominion, or control of the use of the automobile. The use of the terms "loaned" or "borrowed" thus still require inquiry into the insured's control over the automobile. While possession must be temporary in nature, a "borrowing" may be for an indefinite period of time and may in fact last until either the insured decides to return the automobile or the lender requests its return.[83]

The North Dakota Supreme Court has held that "substantial possession and control over the vehicle is consistent with the plain, ordinary definition of 'borrow.'"[84]  And an extensively cited case from the Louisiana Supreme Court held that the majority of courts interpreting such provisions "have also concluded that the term borrow connotes much

---

[81] *Id.*

[82] *See, e.g.*, *id.* at 572 ("By the end of 1980 or early 1981, a few vehicles to which Code Electric held title, including the 1972 pickup, had Aztec logos displayed on them *and were being used primarily by Aztec.*" (emphasis added)).

[83] *"Borrowed" or "Loaned" Vehicles*, 8A COUCH ON INS. § 118:50 (3d ed. 2005) (footnotes omitted); *see also Covered Autos*, 3 INS. CLAIMS & DISPUTES § 11:36 (6th ed. 2013) ("One must have possession of the vehicle in order to have borrowed the vehicle.").

[84] *Hanneman v. Cont'l W. Ins. Co.*, 575 N.W.2d 445, 452 (N.D. 1998).

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 17 of 21

more than merely receiving some benefit from another's use of a third person's vehicle. They have determined that borrowing a car requires possession reflecting dominion and control over the vehicle."[85]

In this case, Mr. Neill testified at deposition that the members of the LLC could be considered to have "borrowed" the vehicles to use them as needed while at the cabin. He also testified that John "probably" drove the Suburban in the days preceding the accident, although he then changed his response to "possibly."[86]  Each member of PWC possessed keys to the vehicles; in addition, the keys hung on a hook in the cabin.[87]

The Court finds that there are no issue of triable fact precluding summary judgment.  For even if John had used the Suburban earlier in the week, Mr. Johnson has failed to proffer any evidence that John was "borrow[ing]" the Suburban at the time of the accident.  John was not in the vehicle for the halibut fishing trip, and Mr. Johnson has presented no evidence that John had possession or control of the vehicle immediately before the group left the cabin.  Accordingly, the Court will grant summary judgment to RLI on this basis for coverage under the umbrella policy because no reasonable jury could find that the vehicle was borrowed by John on the evidence provided.

### 3. Was John Using the Suburban as a Temporary Substitute for his own Vehicle?

Like the terms "own" and "borrow," "temporary substitute" is not defined in the RLI policy.  Mr. Johnson argues that it covers any vehicle John was using instead of a vehicle

---

[85] *Schroeder v. Bd. of Sup'rs of La. State Univ.*, 591 So.2d 342, 347 (La. 1991).

[86] Docket 51-17 (Neill 30(b)(6) Depo.) at Tr. 50–51, 64.

[87] Docket 51-17 (Neill 30(b)(6) Depo.) at Tr. 46.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 18 of 21

he owned.  Mr. Johnson also argues that because only the Suburban could seat all the halibut fishing trip participants, it was being used as a substitute for other vehicles that would not have provided enough room.[88]

Under Arizona law, the purpose of a temporary substitute vehicle provision is to extend temporary protection to an insured who is unable to use an insured vehicle because of its breakdown, repair, servicing, damage or loss.[89]  The substitute vehicle must be used "'for the same use' as the disabled insured vehicle" and this should "be measured by the [t]ime and the circumstances involved."[90]  This interpretation conforms with the analysis of the term "temporary substitute" in treatises and in other jurisdictions.[91] While many insurance policies define "temporary substitute" to make this purpose explicit,

---

[88] Docket 78 at 10–11.

[89] *See Fulton v. Woodford*, 498 P.2d 564, 569 (Ariz. Ct. App. 1972).

[90] *Sellers v. Allstate Ins. Co.*, 544 P.2d 699, 702 (Ariz. Ct. App. 1976) (citing *W. Cas. & Sur. Co. v. Norman*, 197 F.2d 67, 69 (5th Cir. 1952) ("To authorize such extension the party claiming it should, (certainly when in his power, as here), adduce testimony which is sufficient to show, not only that the insured vehicle had been withdrawn from service because of a breakdown, but also that except for this the insured car would have been in use at the time and in the circumstances involved. Such showing is necessary to establish 'temporary use as a substitute,' i.e., a car put in place of another.")).

[91] *See, e.g.*, *Requirement that Withdrawal be due to Breakdown, Repair, Servicing, Loss, Destruction, and the Like*, 8A COUCH ON INS. § 117:74 (3d ed. 2005) ("In order for the substitute vehicle to be covered, it must be shown, under the terms of the 'substitution' provision, that the described vehicle has been withdrawn from normal use because of its 'breakdown, repair, servicing, loss, or destruction.'"); *Houston Gen. Ins. Co. v. Am. Fence Co.*, 115 F.3d 805, 807 (10th Cir. 1997) ("The objective of the substitution provision is to afford temporary coverage to an insured who is using a borrowed vehicle because he or she is unable to use the vehicle designated in the policy for one of the specified reasons.") (collecting cases examining purpose).

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 19 of 21

the Court holds that under Arizona law, "temporary substitute" in the RLI policy is unambiguous and in "common sense" can only be read to conform to this purpose.[92]

Mr. Johnson has provided no evidence that John was using the Suburban because he was unable to use his other vehicles due to breakdown, repairs, or the like. Instead, the two theories Mr. Johnson asserts are based on convenience—that Robert was using the Suburban because of its capacity and its location. Setting aside the fact that it was Robert and not John using the vehicle, convenience does not appear to be a recognized basis for finding that a vehicle is being used as a temporary substitute—the Court could find no such cases and Mr. Johnson has not provided any. Thus, the Court will grant summary judgment to RLI on this basis for coverage under the umbrella policy because no reasonable jury could find that the vehicle was a temporary substitute on the evidence provided.

Because no reasonable jury could find that John owned, borrowed, or temporarily substituted the Suburban when Robert drove it on the halibut fishing trip, Robert's use of the Suburban is not covered under the RLI policy. Accordingly, the Court need not reach the issue of whether John personally gave Robert permission to use the vehicle for that trip. The Court will grant summary judgment to RLI that Robert was not covered by John's RLI umbrella policy at the time of the accident.

## V.    Bad Faith and Punitive Damages

Count III alleges a claim for bad faith arising out of RLI's alleged breach of the duty to defend or indemnify. Mr. Johnson also alleges that "RLI's actions were motivated by

---

[92] *Emp'rs Mut. Cas. Co. v. DGG & CAR, Inc.*, 183 P.3d 513, 515 (Ariz. 2008) (holding that courts should apply "common sense").

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 20 of 21

financial gain and were outrageous or done with reckless indifference to the interests of Kathleen Stenehjem, in her capacity as the personal representative for the Estate of Robert Stenehjem, Sr., justifying an award of punitive damages."[93]   As the Court has found that Robert was not covered by the RLI umbrella policy while he was driving the Suburban, RLI cannot be liable for bad faith or punitive damages.[94] Accordingly, the Court will grant summary judgment to RLI on these claims.

## CONCLUSION

Based on the foregoing, the Court DENIES Plaintiff Keith Johnson's motion for summary judgment at Docket 42.  The Court GRANTS RLI's cross-motion for summary judgment at Docket 52.

The Clerk of Court is directed to enter judgment accordingly.

DATED this 29th day of February, 2016.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[93] Docket 1-1 (Complaint) at 7.

[94] As discussed above, the Court applies North Dakota law to issues of performance. *See supra*, at pages 7–9. Under North Dakota law, an insurer has a "duty to act fairly and in good faith in its contractual relationship with its policyholders." *Hanson v. Cincinnati Life Ins. Co.*, 571 N.W.2d 363, 369 (N.D. 1997). The Court has held that Robert was not a "policyholder"; thus, RLI did not owe him a duty to act fairly and in good faith.

3:14-cv-00095-SLG, *Johnson v. RLI*
Order re Cross Motions for Summary Judgment
Page 21 of 21